IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DONALD EDWARD McGEHEE and | ) | Case No. 05-61264 |
| SHAROL LAYNE McGEHEE, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| J. KEVIN CHECKETT, | ) | Adversary No. 05-6113 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD EDWARD McGEHEE, | ) | |
| SHAROL LAYNE McGEHEE, | ) | |
| GLEN McGEHEE, and | ) | |
| JULIE COBLE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The Chapter 7 Trustee filed this adversary action seeking turnover of funds in three

investment accounts held in the names of Debtors Donald McGehee ("Don") and Sharol

McGehee ("Sharol"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(E) over which

the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The

following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule

52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule

7052 of the Federal Rules of Bankruptcy Procedure.

The Debtors filed a voluntary Chapter 7 bankruptcy petition on May 13, 2005. The

Debtors' names are on three investment accounts which are at issue in this adversary action.

The first account is an AXA Advisors investment account on which Sharol is listed as the sole owner, consisting of funds given to her by her elderly father to be used in his care (the "Sharol Account").  The second account is an AG Edwards investment account held jointly in the names of Don and his brother, Glenn McGehee, for their father, much the same as the one for Sharol's mother (the "Don/Glenn Account").  The third account is an AXA Advisors investment account held in the names of Sharol and her daughter, Julie Coble, representing funds contributed by Sharol and Sharol's father to be used to educate Julie's son, Logan (the "Sharol/Julie Account").  The Trustee asserts that the funds in each of these accounts are property of Don and Sharol's bankruptcy estate and seeks their turnover.  Don and Sharol allege that, although their names are on each of the accounts, the funds in each instance belong to someone else and, therefore, should not be considered property of their bankruptcy estate.

Section 541 of the Bankruptcy Code provides that the bankruptcy estate is comprised of all property in which the debtors have a legal or equitable interest.[1]  Because Don and Sharol's names are on the above-described accounts, they have legal interests in them.[2]  The Debtors argue that, despite their legal ownership of the various accounts, they hold the funds "in trust" for Sharol's father, Don's mother, and Logan.  Therefore, the Debtors argue, the court should impose an implied trust on the accounts, finding that Sharol and Don merely hold the money in trust for their parents and grandchild and removing it from the Debtors'

---

[1]  11 U.S.C. § 541(a)(1).

[2]  *See In re DelaRosa*, 249 B.R. 790, 792 (Bankr. W.D. Mo. 2000).

bankruptcy estate.

The Trustee contends that Sharol and Don created both the Sharol Account and the Don/Glenn Account for Medicaid planning purposes and, therefore, the funds should not be subject to an implied trust.  As to the Sharol/Julie Account, the Trustee asserts it did not comply with the Missouri Uniform Transfers to Minors Act and therefore does not belong to Logan.

An implied trust results or arises by operation of law from the facts of the transaction, not from an agreement, and it results or arises, if at all, at the time the legal ownership is created.[3]  The implied trust must result or arise from the facts occurring at the time of or anterior to the execution of the conveyance by which the title passes and cannot be created by subsequent occurrences.[4]  In order to establish an implied trust, "an extraordinary degree of proof is required; a preponderance is not sufficient, but the evidence must be so clear, cogent, positive, and convincing as to exclude every reasonable doubt from the [court]'s mind"[5] that a trust should be implied.

Missouri courts recognize two classes of implied trusts:  constructive trusts and resulting trusts.[6]  Constructive trusts rest upon public policy,[7] and are a method by which a

---

[3]  *Parker v. Blakeley*, 93 S.W.2d 981, 988 (Mo. 1936).

[4]  *Id*. (citations omitted).

[5]  *Id.* at 987-88 (citation and internal quotemarks omitted).

[6]  *Id*. at 988.

[7]  *Id*.

3

court exercises its equitable powers to remedy a situation where a party has been wrongfully deprived of some right, title, benefit or interest in property as a result of fraud or in violation of confidence or faith reposed in another.[8]  The purpose of a constructive trust is to restore to the rightful owner of the property wrongfully withheld by the defendant.[9]  It has been described as "a fluid, flexible device which may be employed to remedy many different types of injustice," including unjust enrichment or mistake.[10]  "The equities of the situation must shape the measure of the relief, if any."[11]

A resulting trust, on the other hand, is based on the presumed intention of the parties and arises where the intent may be reasonably presumed, as determined from the facts and circumstances existing at the time of the transaction out of which the trust is sought to be established.[12]

## I. *The Sharol Account*

The Trustee asserts that Sharol and her father put his money into Sharol's name alone to shield it from the government seeking reimbursement for Medicaid coverage for Sharol's

---

[8]  *O'Neal v. Southwest Mo. Bank of Carthage (In re Broadview Lumber Co.)*, 118 F.3d 1246, 1253 (8th Cir. 1997).

[9]  *Id.*

[10]  *Brown v. Brown*, 152 S.W.3d 911, 917-918 (Mo. Ct. App. 2005) ("[T]he touchstone for imposition of a constructive trust is injustice or unfairness, which may take the form or be the product of fraud (actual or constructive), abuse of a fiduciary or confidential relationship, undue influence, or unjust enrichment.").

[11]  *Id.* at 918.

[12]  *Parker v. Blakeley*, 93 S.W.2d at 988.

mother and to reduce Sharol's father's assets so he would be eligible for Medicaid sooner himself.

Sharol is a clinical psychologist. She runs her own independent clinic with five professionals working there. Sharol testified that she is familiar with Medicaid eligibility through her clinic where she often bills her patients' accounts through Medicaid.

Sharol is also familiar with Medicaid eligibility due to her experience when her mother was in a skilled nursing facility prior to her death in March of 2003. Sharol testified that although Medicare and insurance paid for her mother's medical care, it did not pay the rent for the room in the skilled nursing facility. Sharol also testified that, after her parents spent a large part of their money, approximately $200,000, on her mother's long-term care, they applied for Medicaid benefits. At that time, they opened an account in Sharol and her mother's names and, knowing her mother would not be eligible for Medicaid if her mother had more than $999 in assets, Sharol made certain that account never had more than $999 in it after that point. Medicaid then covered part of Sharol's mother's care.

In the summer of 2003, after Sharol's mother died, Sharol's father received a notice from Medicaid saying that, after his death, Medicaid would assert a claim against his estate for reimbursement of  Medicaid funds used to pay for Sharol's mother's care. After receiving that notice, Sharol and her father moved the majority of what money he had left, approximately $20,000, into the Sharol Account in Sharol's name alone. They avoided gift tax liability by treating the transfer as $10,000 gifts from the father to each Sharol and Don. All of the money currently in the Sharol Account came from Sharol's father.

5

Sharol's father, who is ninety years old, is currently living in an independent living apartment. Sharol and her father have a joint checking account from which they pay for his daily living expenses. The money in that joint account comes from his social security and investments and, at the time of the hearing on this Motion, the joint checking account contained approximately $12,000. Sharol and her father pay most of his bills from that checking account. The Chapter 7 Trustee in this case abandoned the joint account so that Sharol and her father could use it to pay his living expenses. Sharol's father's only assets are this joint checking account and the interest the Debtors claim he asserts in the Sharol Account.

Sharol testified that, if her father moves from the independent living apartment into a skilled nursing facility, Medicare only covers part of the cost of the facility and only under certain conditions. Sharol's father also has supplementary care insurance, but it will not pay a significant amount for a long-term skilled nursing facility, either. The only way for her father to get long-term skilled nursing care would be for him to either spend his own money or go on Medicaid. In order to be eligible for Medicaid, Sharol's father would have to exhaust all but $999 of the money in the joint checking account, and, if he still owned the money in the Sharol Account, he would have to exhaust all of that money as well before Medicaid would kick in.

Sharol offered several reasons as to the purpose of the transfer of the $20,000 into the Sharol Account. One of the purposes was to prevent Medicaid from taking it as reimbursement for her mother's care after receiving the letter from Medicaid in the summer

6

of 2003.  She also said it was because she was concerned about her father's ability to manage his money and the transfer was made so she could handle his affairs, although she also said her father currently pays most of his bills from the joint checking account.  She also conceded that the transfer resulted in her father being eligible for Medicaid after the balance in the joint checking account declined to $999 and, thus, one of the benefits of transferring the money out of his name is that he will now be eligible for Medicaid without having to spend the money in the Sharol Account for his own long term care.  Sharol testified, however, that she considers the money to be her father's and that she would never spend it on herself, even to avoid having to file for bankruptcy protection.

Based on Sharol's testimony and the evidence presented at hearing, I find that Sharol and her father intentionally placed the money in Sharol's name alone in order to protect the money from the government taking it as reimbursement for her mother's care.  It also made her father eligible for Medicaid without having to spend that money first.  It is plausible that they might also have been concerned about Sharol's future ability to manage his funds in the event he became unable to do so, but Sharol testified that her father currently pays most of his bills and takes pride in his ability to do so.  She also acknowledged that they could have achieved the same result by putting the money into a joint account, from which Sharol could have managed his money and paid his bills when he became unable to do so, but, as she said, Medicaid could then take it.

Sharol may consider the money to be her father's, but because her father intentionally transferred it to her to prevent the government from taking it, I find that the circumstances

do not warrant the imposition of a constructive trust.  Again, the purpose of a constructive

trust is to restore to the rightful owner property wrongfully withheld by the defendant,[13]

whether due to fraud, unjust enrichment, or mistake.  In this case, Sharol is not wrongfully

withholding the money from her father, nor is there any unjust enrichment or mistake to

correct, because he gave her the money and she owns it as her father intended when he

transferred it to her for the purpose of, among other things, preventing the government from

taking it.

Nor do I find any injustice in this result: Sharol and her father cannot expect the court

to permit them to take the dual position that: (a)  Sharol owns the money for the purpose of

preventing his creditors (Medicaid) from getting it; but (b) her father owns it for the purpose

of preventing her creditors (the Trustee) from getting it.  In sum,  if Sharol owns the funds

for one purpose, she owns it for all purposes.  I find, therefore, that the equities of the

situation do not warrant the imposition of a constructive trust.[14]

Nor does this situation call for the imposition of a resulting trust.  A resulting trust is

based on the presumed intention of the parties, as determined from the facts and

circumstances existing at the time of the transaction occurred.  I find, based on the evidence

and testimony, that at the time Sharol's father transferred the money into Sharol's name, they

did so with the intent that she own it – so that Medicaid could not take it.  If they intended

Sharol to own it for one purpose, she owns it for all purposes.  Thus, I find that the Sharol

---

[13] *Id.*

[14] *Id.*

8

Account is titled as she and her father intended it to be at the time of the transfer and, therefore, the facts do not warrant the finding of a resulting trust for his benefit.

## II.  *The Don/Glenn Account*

Don is also a clinical psychologist.  Glenn is Don's brother.  Their mother, Lula Mae Townsend, is ninety-two years old and resides by herself in her own home.  She is an independent woman who is able to take care of herself, except for her financial matters and paying bills, which Glenn manages for her.  Similar to the situation with Sharol's father, Lula Mae has a joint checking account with Glenn and Don from which they can write checks and pay bills, but it is Glenn who pays all or nearly all of Lula Mae's bills from this account.  This account has about $1,300 in it and the Trustee does not seek its turnover.

Glenn testified that, after his stepfather died some years ago, Lula Mae sold her house and cashed in her CDs and put those funds into an investment account held jointly in the names of Lula Mae and Glenn as joint tenants (the "Glenn/Lula Account").  Lula Mae's house proceeds and CDs were the sole source of funds in that account.  In about October of 2002, at the suggestion of financial advisors, they opened the Don/Glenn Account by transferring all of the money in the Glenn/Lula Account, which was approximately $31,000, into the Don/Glenn Account.  Lula Mae's name was, therefore, removed from the investment account at that time.

Glenn testified that, although he understood his mother would become eligible for Medicaid sooner if she no longer owned the investment account, the primary reason her name was removed from that account was that her memory was failing and she was making errors

9

in handling her money, such as paying the same bill twice and sending checks to the wrong creditors and so forth.  He also testified that financial advisors had suggested they take the money out of her name, at least in part, for Medicaid planning purposes.  Both brothers testified to the effect that Medicaid eligibility was "in the back of their minds" or was one of the reasons they removed her name from the account, but it was not done specifically for Medicaid planning purposes.  They also say the Don/Glenn Account was created for estate planning purposes.  The brothers acknowledged that the funds could have been placed into a joint account with Lula Mae's name on it in order to achieve the goals of estate planning and allowing them to manage her affairs if she became unable, but that would not have achieved the third goal of making her eligible for Medicaid.

For the same reasons discussed above regarding the Sharol Account, I find that the circumstances do not warrant the imposition of either a constructive or resulting trust on the Don/Glenn Account, given the fact that the transfer was admittedly made, at least in part, with the intent to make their mother eligible for Medicaid without having to exhaust those funds.  It is, therefore, owned by Don and Glenn and the circumstances do not warrant the imposition of a constructive or resulting trust.

However, unlike the Sharol Account which is owned solely by her, Don owns this account jointly with his brother, Glenn, and so the extent of each of their respective interests in the funds is at issue here.  According to the account statement from A.G. Edwards, the Don/Glenn Account is held by them as joint tenants.

"Although disproportionate contributions to the fund by one joint owner may be

10

shown to establish a different interest, the interests of joint tenants are presumed to be equal."[15]  The presumption of equal ownership should prevail in the absence of proof of ownership in some other proportion and anyone attacking equal ownership bears the burden of proof.[16]  And, the Missouri Court of Appeals has held, where neither of the two remaining joint tenants contributed any funds to the disputed account because a third party contributed all the money into it, the court was obligated to hold that the joint account was equally owned by the two remaining parties after the contributing tenant died.[17]

Here, the parties testified that the Don/Glenn Account was created when Glenn and Lula closed the Glenn/Lula Account and put those funds into the Don/Glenn Account, removing Lula's name.  Thus, in order to determine the proportionate ownership of the Don/Glenn Account by looking at the relative contributions, we start with the question of who owned the Glenn/Lula Account.

The Glenn/Lula Account was held by Glenn and Lula as joint tenants, and so there is a presumption that they owned it equally.  However, according to Glenn's uncontroverted testimony, all of the money in the Glenn/Lula Account was contributed by Lula.  I find, therefore, that the presumption of equal ownership was rebutted as to the Glenn/Lula Account and that all of the money in the Glenn/Lula Account belonged to Lula.

---

[15]  *Blue Valley Federal Sav. & Loan Assoc. v. Burrus*, 637 S.W.2d 737, 743 (Mo. Ct. App. 1982).

[16]  *Id*. (citation omitted).

[17]  *Id*. at 744.

11

In turn, because the undisputed evidence was that the source of funds in the Don/Glenn Account was the funds from the Glenn/Lula Account (which was owned by Lula), and neither Don nor Glenn contributed any funds to the Don/Glenn Account, the presumption of equal ownership is not rebutted. Don and Glenn own the Don/Glenn Account in equal shares.

I emphasize that my finding that Lula was the sole owner of the funds in the Glenn/Lula Account, based on her contribution, is not grounded on an implied trust. Rather, while Lula was still a joint owner, the source of funds is relevant in determining the relative interests of the joint tenants in the account.[18] Since Lula was not a joint owner of the Don/Glenn Account, however, her contribution is no longer relevant to ownership; rather, in order to find Lula to have an interest in the Don/Glenn Account, an implied trust must be imposed. As discussed above, I find that the circumstances do not warrant the imposition of such a trust in this case.[19]

Thus, Don and Glenn own the Don/Glenn Account as equal joint tenants, and, since

---

[18] *Peters v. Carr*, 654 S.W.2d at 322-23.

[19] I note that had Lula Mae testified that she did not participate in the decision to transfer the money from the Glenn/Lula Account to the Don/Glenn Account, a constructive trust would likely have been warranted. *See Peters v. Carr*, 654 S.W.2d at 322-23 (when one joint tenant withdraws all or part of the fund so as to divest the other joint tenant of his right to the funds, a constructive trust may be impressed on the funds wherever they may be traced). However, counsel conceded at the beginning of the hearing that Lula Mae intended that the money be transferred to her sons for them to use for her care. Thus, Glenn did not divest his mother of her right to the funds: she voluntarily transferred such funds to him and Don.

the creditors of one of the joint tenants cannot reach the other joint tenant's half,[20] one half

of the funds in the Don/Glenn Account is property of the Debtors' bankruptcy estate.

### III.   *The Sharol/Julie Account*

Sharol testified that the Sharol/Julie Account was created with Sharol's funds after

Julie's son, Logan, was born in January 2003.  The account was intended for his education

but, according to Julie, if he receives scholarships or other funding for his education, he

would be permitted to use it to buy a house or some other purpose.  According to the account

statement from AXA Advisors, the account is held in Sharol and Julie's names as joint

tenants with right of survivorship.  Logan's name is not on the account.  At the time of the

hearing on this Motion, the account had a balance of about $2,200.

The Missouri Uniform Transfers to Minors Act allows property to be transferred to

a minor by transferring the property to a custodian for the minor as provided by statute:

> Property may be transferred to a person, who is a minor on the date of the
> transfer, by transferring the property to a custodian for the minor under
> sections 404.005 to 404.094.[21]

Section 404.047(2) provides the method by which transfers of money to a custodian for a

minor shall be made.[22]  Property held for minors in accounts that are not created in

accordance with MUTMA are not irrevocable and, therefore, they remain in the debtor's

---

[20]    *Peters v. Carr*, 654 S.W.2d at 322-23.  *Accord Watlow Elec. Mfg. Co. v. Wrob*, 881 S.W.2d 650, 651 (Mo. Ct. App. 1994); *Greenwood v. Bank of Illmo*, 782 S.W.2d 783 (Mo. Ct. App. 1989).

[21]    Mo. Rev. Stat. § 404.011; *In re DelaRosa*, 249 B.R. at 792.

[22]    *Farrell v. Coulter*, 898 S.W.2d 139, 140 (Mo. Ct. App. 1995).

control and are subject to the claims of the debtor's creditors.[23]  This is especially true when the account was not a joint account held with the child.[24]

In this case, the Debtors offered no evidence that they followed any of the procedures required by the statute to transfer the money to Logan, or to Julie as Logan's custodian. Sharol and Julie each have control over the account and either of them could have withdrawn the money at any time.  Logan's name does not appear on the account, nor has it ever been held in his name.  Consequently, the Sharol/Julie Account does not belong to Logan.

However, Sharol owns this account jointly with Julie.  Therefore, the issue of relative contribution again comes into play.[25]  Again, we start with the presumption that they own it equally.  According to the testimony at the hearing, however, Sharol contributed all of the funds in that account, except for $1,000 that was contributed by Sharol's father.  Julie did not contribute any funds into this account.  Consequently, Julie is presumed to own a one-half interest in the $1,000 contributed by Sharol's father,[26] but the presumption is rebutted as to the remaining funds, which Sharol contributed.  Consequently, Julie owns $500 in the Sharol/Julie Account, and Sharol owns the remainder.

CONCLUSION

As noted above, an "extraordinary degree of proof" is required to demonstrate that an

---

[23]  *Id.*; *In re DelaRosa*, 249 B.R. at 793.

[24]  *Id.*

[25]  *See Watlow Elec. v. Wrob*, 881 S.W.2d 650.

[26]  *Blue Valley Federal v. Burrus*, 637 S.W.2d at 743.

14

implied trust should be imposed,[27] and the Debtors simply have not met that burden here.

For the foregoing reasons, I therefore find that (i) all of the funds in the Sharol Account are property of the Debtors' bankruptcy estate; (ii) one half of the funds in the Don/Glenn Account are property of the Debtors' bankruptcy estate; and (iii) all of the funds in the Sharol/Julie Account, except $500, are property of the Debtors' bankruptcy estate. The Debtors will, therefore, be required to turn those funds over to the Chapter 7 Trustee to be administered for the benefit of the Debtors' creditors.

An Order is accordance with this Memorandum Opinion will be entered this date.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: April 10, 2006

Copy to: J. Kevin Checkett
            Sam M. Coring

---

[27] *Parker v. Blakeley,* 93 S.W.2d at 987-88.